## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SCOTT P.,[1]<br>    *Plaintiff*,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>    *Defendant*. | No. 3:22-cv-1228 (VAB) |

## RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Scott P. has filed an administrative appeal under 42 U.S.C. §§ 405(g) and 1383(c)(3) against Kilolo Kijakazi, the Commissioner of Social Security ("Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying his claim for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") under the Social Security Act, or, in the alternative, to remand the case for a new hearing. The Commissioner has moved to affirm the decision.

For the reasons explained below, Scott P.'s motion is **GRANTED** and the Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

---

[1] In opinions issued in cases filed under § 405(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial in order to protect the privacy interests of social security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

    **A. Factual Background**

      1. <u>Disability Application</u>

On October 3, 2017, Scott P. filed claims for DIB and SSI. Pl. Statement of Facts ¶ 1, ECF No. 24-2 (Apr. 4, 2023) ("Pl. Facts"). His application was denied both initially and upon reconsideration. *Id.*

Scott P. requested a hearing and appeared before Administrative Law Judge Dierdre Horton ("ALJ Horton" or "the ALJ") on February 20, 2019. *Id.* ¶ 2.

On April 15, 2019, ALJ Horton denied Scott P.'s claims. *Id.*

Following an unsuccessful appeal to the Appeals Council, which was denied on May 8, 2020, Scott P. appealed to this Court in Case No. 3:20-cv-911-SRU. *Id.* ¶ 3.

On April 14, 2021, the Appeals Council remanded Scott P.'s claims to ALJ Horton. *Id.*

On October 1, 2021, ALJ Horton held a new hearing, and on October 18, 2021, she issued another decision denying Scott P.'s claims. *Id.* ¶ 4.

At Step 2, the ALJ found that Scott P. had severe conditions including status-post thoracic fracture, status post carpal tunnel syndrome on the right, post-traumatic syndrome disorder (PTSD), depression, joint dysfunction, and borderline intellectual functioning. *Id.* ¶ 5.

At Step 3, the ALJ found that no listing was met or equaled. *Id.* The ALJ further determined that in the absence of substance abuse, Scott P. could still perform light work, with further limitations. *Id.*

At Step 4, ALJ Horton determined that Scott P. was unable to perform any past work. *Id.* ¶ 6. The ALJ found that Scott P. could perform four other jobs—photocopy machine operator, mail clerk, price marker, and addresser—if he did not engage in any substance abuse. *Id.*

The ALJ found that Scott P.'s residual functional capacity (RFC) was as follows: in the absence of substance abuse, he could: occasionally navigate ramps and stairs, but not ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and frequently handle. *Id.* ¶ 7. ALJ Horton further found that Scott P. was limited to simple, routine tasks, and that he could not perform belt-work or other pace-dependent work, but that he could work individually and self-pace. *Id.* Finally, the ALJ concluded that Scott P. could not work with the general public or perform collaborative work or teamwork, but that he could occasionally interact with others. *Id.*

The Appeals Council denied Scott P.'s request for review of the decision, making ALJ Horton's decision the final decision of the Commissioner. *Id.* ¶ 4.

2. <u>Medical History</u>

Scott P. was placed in Special Education in third grade and continued to receive special education services until he left school after tenth grade. *Id.* ¶ 8.

He has attempted to complete his GED but has never succeeded. *Id.*

In November 2017, at the initial stage of agency review, Dr. Joseph Duckwell found that Scott P. could perform work at the light exertional level and that he could frequently perform postural maneuvers. *Id.* ¶ 13; Soc. Sec. Transcripts at 94–95, ECF No. 21 (Jan. 3, 2023) ("Tr."). Dr. Duckwell further wrote that Scott P. had a history of fractured vertebrae from 2014 and 2015 and a history of carpal tunnel. Tr. at 94. He further noted that Scott P. could stand or walk for about six hours per eight-hour workday, and that he could frequently climb ramps and stairs; climb ladders, ropes, or scaffolds; balance; stoop; kneel; and crawl. *Id.* at 95.

Consultative examiner, Dr. Marc Hillbrand, examined Scott P. and provided reports three different times, in January 2017, October 2017, and March 2018. *Id.* ¶ 14; Def. Resp. to Pl.'s

Statement of Facts ¶ 14(a), ECF No. 27-2 (May 3, 2023) ("Def. Facts").

On January 17, 2017, Dr. Hillbrand found that Scott. P. was generally able to perform his activities of daily living. Tr. at 544. His verbal and nonverbal reasoning abilities appeared intact. Tr. at 544. His attention, concentration, and short-term memory were within normal limits. *Id.* His Repetitions, Calculations and Similarities scores on the COGNISTAT were mildly impaired, although his other scores were in the average range. *Id.* Scott P.'s intellectual abilities were assessed to be in the "low average range." *Id.* Overall, Dr. Hillbrand assessed that his ability to comprehend, retain, and carry out simple tasks was minimally impaired; his ability to comprehend, retain, and carry out complex tasks was mildly impaired; and his ability to interact appropriately with others was moderately impaired. *Id.* at 545.

On October 17, 2017, Dr. Hillbrand assessed that Scott P.'s condition was largely the same as at the previous evaluation. He additionally found that Scott P. was "cognitively globally intact" but that he was struggling with substance use disorder, PTSD, and major depressive disorder. *Id.* at 1048.

In February 2018, Dr. David Braverman assessed Scott P. and found that he could perform work at the medium exertional level and that he could frequently perform postural maneuvers and frequently handle. Pl. Facts ¶ 13.

On March 1, 2018, Dr. Hillbrand conducted cognitive testing (WAIS-IV) on Scott P., and determined that Scott P. had a Full Scale IQ score of 73 (4th percentile and "low end of the borderline intellectual functioning range") and a Verbal Comprehension Index score of 80 (9th percentile). *Id.* ¶ 9. Dr. Hillbrand concluded that "[Plaintiff]'s ability to comprehend, retain, and carry out simple tasks is mildly impaired. His ability to comprehend, retain, and carryout complex tasks is moderately impaired. His ability to interact appropriately with supervisors,

coworkers, and general public is moderately impaired." Def. Facts ¶ 9(a); Tr. 1056. Dr. Hillbrand reported that Scott P. demonstrated evidence of applying himself to the fullest of his abilities. *Id.* These scores placed Scott P. in Level 5 for both General Learning Ability and Verbal Aptitude, although Dr. Hillbrand did not specifically note this in his evaluation. *Id.*; Pl. Facts ¶ 9.

On August 14, 2019, Scott P. was prescribed a cane upon his request. Pl. Facts ¶ 17; Def Facts Pl. ¶ 17(a); Tr. 1737–38.

On May 14, 2021, consultative psychologist Dr. Joseph Klim examined Scott P. and provided reports. Pl. Facts ¶ 15; Def. Facts ¶ 15(a). He noted that Scott P. had low concentration, persistence, and pace tolerance, but retained the ability to do routine repetitive work. Pl. Facts ¶ 15. He also noted that, when in a low-demand environment, Scott P. could maintain the attention necessary and manage his anxiety and depression adequately to complete simple tasks. *Id.* Dr. Klim also wrote the following: "The claimant can likely follow and understand simple instructions and directions and maintain a schedule with prompting. His attention and concentration abilities are judged to be mildly to moderately impaired. His short-term memory abilities are judged to be intact. He may struggle at times to learn and perform new or complex tasks secondary to his attentional difficulties combined with his depressive, anxious, and PTSD symptoms. At times his fluctuating mood may impair his ability to relate easily to others and manage his stress levels effectively. His decision-making abilities are judged to be fair and poor at times." Def. Facts ¶ 15(a); Tr. 1733.

After the first administrative hearing, counsel for Scott P. asked a vocational expert, David Meuse, M.S., CRC, to provide an opinion about the vocational implications of aptitudes in the lowest 10th percentile. Pl. Facts ¶ 10.

After the second hearing, counsel submitted Mr. Meuse's affidavit to the ALJ, who

refused to accept it based on reasoning provided in the decision. *Id.* ¶ 10; Def. Facts ¶ 11(a). Mr. Meuse stated that, in his professional opinion, Scott P. would be precluded from almost all competitive employment because he was in the lowest tenth percentile or below in the following areas: verbal comprehension, perceptual reasoning, processing speed, working memory, and full scale IQ. Meuse Affidavit, ECF No. 23-1 ¶ 13. (Mar. 6, 2023). Mr. Meuse concluded that because Scott P. was in the lowest 10% in the nation in working memory, he would require far more than the normal level of supervision. Pl. Facts ¶ 11. He further stated that, in his opinion, based on the aptitudes identified by Dr. Hillbrand, the five jobs identified by Mary Vasishth, SSA's vocational expert, at the administrative hearing would not be appropriate for Scott P. Meuse Affidavit ¶¶ 17–18.

### B. Procedural History

On March 6, 2023, Scott P. filed a brief seeking the reversal of the decision of the Commissioner. ECF No. 23 ("Pl. Brief").

On April 4, 2023, Scott P. filed a motion for leave to file a motion for an order reversing the decision of the commissioner and a statement of material facts, in order to comply with the District of Connecticut's 2018 Standing Scheduling Order regarding social security cases. ECF No. 24.

On April 5, the Court granted Scott P.'s motion for leave to file additional documents and Scott P. subsequently filed such documents. Order, ECF No. 25; Mot. to Reverse Decision of the Comm'r, ECF No. 26; Pl. Facts.

On May 3, 2023, the Commissioner filed a motion to affirm the decision of the Commissioner. Mot. to Affirm the Decision of the Comm'r, ECF No. 27; Mem. in Support of Mot. to Affirm the Decision of the Comm'r, ECF No. 27-1 ("Def. Brief"); Def. Facts.

On May 16, 2023, Scott P. filed a memorandum in opposition to the motion to affirm. ECF No. 28 ("Pl. Opp.").

## II.      STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). It is generally "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, No. 3:16-cv-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675

F.2d 55, 57 (2d Cir. 1982)). On the other hand, "[a]n ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). A court generally need not remand a case if the ALJ only committed harmless error, such that "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.   DISCUSSION

In order to be entitled to benefits under the Social Security Act, a plaintiff must demonstrate that they have a disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). This determination is made through a five-step evaluation.

First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(b).

If they are not engaged in such activity, the ALJ must proceed to Step Two to determine whether the claimant has a severe medically determinable impairment or combination of impairments. *Id.* § 404.1520(c). An impairment will be considered severe if it significantly limits a claimant's ability to perform "basic work activities." *Id.*

If the claimant has a medically determinable severe impairment, the ALJ proceeds to Step Three to determine whether any identified severe impairments meet or medically equal those

identified in Appendix 1. *Id.* § 404.1520(d). These impairments are *per se* disabling, assuming a claimant meets the duration requirement. *Id.*

If the claimant's impairments are not *per se* disabling, then the ALJ proceeds to Step Four, which entails assessing the claimant's residual functional capacity, or their ability to work in light of their limitations. *Id.* §§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545(a)(1).

At Step Five, the ALJ must establish whether the claimant's residual functional capacity will allow the performance of any past relevant work. If the claimant is unable to perform past relevant work, the ALJ bears the burden of proving that, accounting for the claimant's age, education, work experience, and residual functional capacity, the claimant can perform other work that exists in significant numbers in the national economy. *Id.* § 404.1520(g)(1). If the ALJ proves all of that, then the claimant is not disabled. *Id.*

The claimant bears the burden of proving the requirements of Steps One through Four, after which the burden shifts to the Agency to prove that the claimant is capable of working. *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("The burden is on the claimant to prove that he is disabled within the meaning of the Act . . . . However, if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the Secretary to show there is other gainful work in the national economy which the claimant could perform.").

Scott P. argues that the Commissioner's decision should be reversed on the basis of three errors. First, he argues that the ALJ failed to adequately consider post-hearing vocational evidence regarding his ability to perform the jobs relied upon by the ALJ at Step Five of the evaluation. Second, he argues that the ALJ's assessment of his residual functional capacity was not supported by substantial evidence. Finally, Scott P. argues that the ALJ erred by relying upon

two obsolete sedentary jobs at Step Five.

The Court addresses each argument in turn.

### A.  Post-Hearing Vocational Evidence

After the second administrative hearing, counsel for Scott P. submitted the affidavit of vocational expert David Meuse to ALJ Horton. The affidavit provided Mr. Meuse's opinion that the jobs identified at the hearing by Mary Vasishth, the Agency's vocational expert, would not be appropriate for Scott P. *See* Meuse Affidavit at 2. Mr. Meuse based this conclusion on Dr. Hillbrand's March 2018 assessment, which found that Scott P.'s Verbal Comprehension Index was in the ninth percentile, his Perceptual Reasoning Index was in the third percentile, his Working Memory Index was in the ninth percentile, his Processing Speed Index was in the tenth percentile, and his Full Scale IQ was in the fourth percentile. *Id.* In Mr. Meuse's professional opinion, almost all competitive employment would require being at least above the tenth percentile in each of those areas. *Id.*

ALJ Horton refused to accept Mr. Meuse's affidavit, and offered the following three reasons in her decision: (1) Mr. Meuse was not a licensed psychologist or psychiatrist, so it was not clear what skills or training he relied upon in order to conduct his assessment; (2) Mr. Meuse ignored Dr. Hillbrand's functional assessment; and (3) he relied upon "cherry picked test scores," such as Scott P.'s IQ score. Tr. at 1158.

Scott P. argues that the ALJ's decision should be overturned and the case should be remanded because, in refusing to accept the affidavit, the ALJ refused to consider relevant and probative evidence. Pl. Brief at 4. Scott P. challenges the ALJ's stated reasons for disregarding the affidavit. First, he argues that Mr. Meuse never claimed to be a licensed psychologist or psychiatrist, and that his role was merely to offer an opinion on the vocational implications of

Scott P.'s aptitudes, as determined by Dr. Hillbrand—a task he was qualified to perform as a vocational expert. *Id.* at 5–8. Second, he argues that Mr. Meuse's affidavit did not rely on isolated test scores, but rather incorporated other parts of Dr. Hillbrand's assessment, including functional assessments, such as Scott P.'s working memory. *Id.* at 9.

The Commissioner responds that ALJs have no obligation to consider post-hearing objections or evidence, and that they further are not required to provide reasons for not using the provided objection or rationale in their decisions. Def. Brief at 15–16, citing *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (explaining that an ALJ is not required to discuss on the record their reasons for rejecting rebuttal vocational testimony offered by the claimant; Hearings, Appeals, and Litigation Law Manual (HALLEX) I-2-8-13(b) ("An ALJ is not required to use language or rationale from any submitted brief or written statement. An ALJ also is not required to provide reasons for not using the provided language or rationale in the decision."). Nevertheless, the Commissioner argues that ALJ Horton explained in detail why she refused to accept Scott P.'s post-hearing submission, although she was not required to do so, and that ALJs are entitled to decide which pieces of evidence to consider when making their RFC determination. *Id.* at 17.

Scott P. replies that the ALJ misunderstood the vocational testimony offered by Mr. Meuse, and mistakenly applied the legal standard for medical opinions when she dismissed his affidavit. Pl. Reply at 2. Scott P. further argues that the Commissioner's position, which excuses ALJs from considering or discussing rebuttal evidence, is incompatible with the general duty of ALJs to resolve conflicts in the evidence and explain their rationale. *Id.* (citing *Richardson*, 402 U.S. at 399; *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013)). Finally, Scott P. argues that comparison to *Brault* is inapposite because that case involved unrebutted testimony by a

witness who had been cross-examined and had provided a reasonable explanation for their conclusions. *Id.* at 5. Here, he argues, the rebuttal evidence demonstrated that the testimony at the hearing was unsupported, and the ALJ thus "rejected vocational evidence that proved [Scott P.] was disabled without a reason that was logical or supported by vocational testimony." *Id.* at 3.

The Court agrees with Scott P., in substantial part.

The Social Security Regulations explicitly state that a claimant has the right to respond to vocational evidence after a hearing. SSR 96-9P, 1996 WL 374185, at *9 n.8 (1996) ("Whenever a [vocational expert] is used, the individual has the right to review and respond to the [vocational expert] evidence prior to the issuance of a decision."). Several courts, although none in this Circuit, have found that this right includes the ability to submit rebuttal vocational expert testimony after a hearing. *See, e.g.*, *Pate v. Saul*, No. 19-cv-11594-PBS, 2020 WL 3105075, at *10 (D. Mass. June 11, 2020) (interpreting SSR 96-9P to "explicitly recognize a party's right to submit rebuttal evidence after a hearing" and finding that the ALJ erred by failing to address an affidavit by the vocational expert, which "raised legitimate challenges" to the agency's vocational expert's testimony); *Patrick S. v. Saul*, 2019 WL 3814283, at *3–4 (D. Me. Aug. 14, 2019) (finding that SSR 96-9P would "seem[] to preclude" the conclusion that affidavits submitted after a hearing could be disregarded by ALJs as untimely). It is unclear, then, whether ALJs have a duty to accept post-hearing vocational evidence in order to comply with SSR 96-9P, as claimed by Scott P.

Yet, in light of the specific facts of this case and the general duty of ALJs to consider all evidence presented in a given case and to investigate any inconsistencies, the Court need not make such a determination. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in

our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'") (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, the ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.").

Here, the ALJ did not reject the Meuse affidavit because it was submitted after the hearing. Rather, she concluded that she would not accept the affidavit because Mr. Meuse was not a psychologist or psychiatrist and was therefore, in her view, unqualified to determine work limitations from a claimant's IQ score. She also disregarded the affidavit because she believed that Mr. Meuse relied on "cherry-picked test scores" while ignoring Dr. Hillbrand's more holistic functional assessment. Tr. at 1169. Neither of these reasons is sufficient to establish "substantial evidence." *Lamay*, 562 F.3d at 507 ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard.").

First, Mr. Meuse did not claim to be a psychologist or a psychiatrist, or even try to play the role of one. Instead, he relied upon the findings from Dr. Hillbrand's report from March 2018, and specifically focused on Scott P.'s various aptitudes as diagnosed by Dr. Hillbrand. Second, Mr. Meuse did not, as the ALJ claimed, translate Scott P.'s IQ score into work limitation, or ignore Dr. Hillbrand's functional assessment. Rather, much like the Agency's own vocational expert, Mr. Meuse provided an assessment of Scott P.'s ability to perform various jobs, given his functional limitations as determined by Dr. Hillbrand.

Indeed, if the ALJ had tried to reconcile the Meuse analysis with Dr. Hillbrand's, rather

than simply dismiss it, the absence of substantial evidence would have been readily apparent. In

his March 2018 assessment, Dr. Hillbrand placed Scott P. on the "low end of the borderline

intellectual functioning range," based on various indices: a Verbal Comprehension Index in the

ninth percentile, a Perceptual Reasoning Index in the third percentile, a Working Memory Index

in the ninth percentile, a Processing Speed Index in the tenth percentile, and a Full Scale IQ was

in the fourth percentile. Tr. at 1053–54. Yet, Dr. Hillbrand concluded that "[Plaintiff]'s ability to

comprehend, retain, and carry out simple tasks is mildly impaired. His ability to comprehend,

retain, and carryout complex tasks is moderately impaired. His ability to interact appropriately

with supervisors, coworkers, and general public is moderately impaired." Def. Facts ¶ 9(a); Tr.

1056. In contrast, based on these same metrics, Mr. Meuse opined that almost all competitive

employment would require being at least above the tenth percentile in each of those areas, *id.* and

a Verbal Comprehension Index score of 80 (ninth percentile). *Id.* ¶ 9.

Dr. Hillbrand may very well not only be able to explain, but also have evidence to

support his seemingly contradictory analysis of someone on the "low end of the borderline

intellectual functioning range" only having a mild or moderate impairment in the workplace. But

there is no such evidence in this record. *See Daniela B. v. Kijakazi*, No. 1:22-cv-03495-NRM,

2023 WL 3719634, at *7 (E.D.N.Y. May 30, 2023) (explaining that an ALJ has an "affirmative

duty to recontact a medical expert if an ALJ makes an initial determination that a medical

expert's opinions are vague or appear to be inconsistent with their examination notes."); *Rosa*,

168 F.3d at 79 ("[W]here there are deficiencies in the record, an ALJ is under an affirmative

obligation to develop a claimant's medical history[.]"). Nor does the ALJ cite to any basis for

rendering her opinion on this critical issue with respect to Scott P, other than wholesale reliance

on Dr. Hillbrand's insufficiently supported conclusions. *See Selian v. Astrue*, 709 F.3d 409, 419

(2d Cir. 2013) (an ALJ's failure to provide "good reasons" for crediting one doctor's diagnosis over another's assessment, "by itself warrants remand").

In addition to failing to address this seemingly contradictory information—and, whether or not the ALJ accepted Mr. Meuse's affidavit, an inherent conflict is raised by Dr. Hillbrand's own work—the ALJ also failed to adequately address the inconsistency she noted between the testimony of the agency vocational expert and the Dictionary of Occupational Titles (DOT). "When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." *See* SSR 00-4P (S.S.A.), 2000 WL 1898704, at *2. "Catch-all questions to the vocational expert regarding any inconsistencies between the expert's testimony and the DOT do not satisfy this duty." *Roberto v. Saul*, No. 20-CV-1923, 2021 WL 3912298, at *6 (E.D.N.Y. Sept. 1, 2021) (internal punctuation marks omitted) (quoting *Patti v. Colvin*, No. 13-CV-1123, 2015 WL 114046, at *6 (W.D.N.Y. Jan. 8, 2015)). "Rather, the ALJ must 'undertake a meaningful investigatory effort' to uncover and resolve an apparent conflict." *Hernandez v. Comm'r of Soc. Sec.*, No. 20-CV-3810 (AMD), 2021 WL 5999623, at *4 (E.D.N.Y. Dec. 19, 2021) (quoting *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 94 (2d Cir. 2019)). A reasonable explanation generally involves either information not listed in the DOT or information more specific than that provided in the DOT. SSR 00-4P, at *2.

Based on testimony by Ms. Vasishth, the ALJ concluded that if Scott P. stopped his substance use, he would be able to five perform jobs that exist in significant numbers in the national economy, namely: photocopy machine operator, mail clerk, price marker, addresser, and document preparer. Tr. at 1168. At the hearing, ALJ Horton asked Ms. Vasishth "whether [her]

testimony [was] consistent with the DOT and its companion publications[.]" Tr. at 1231. Ms. Vasishth replied that there were no inconsistencies. *Id.* The ALJ then asked Ms. Vasishth about areas not addressed in the DOT, to which Ms. Vasishth answered, "Right, like the interaction with coworkers, public, and supervisors, I based that on my experience, knowledge of these positions." *Id.*

In her decision, ALJ Horton wrote that "[p]ursuant to SSR 00-4p . . . the vocational expert's testimony is not entirely consistent with the information contained in the Dictionary of Occupational Titles. Specifically, the Dictionary of Occupational Titles does not describe social interactions with different groups (i.e. the public). However, the undersigned accepts this testimony based upon the vocational expert's professional experience." *Id.* at 1168–69. The ALJ did not provide a precise description of what she perceived to be the inconsistency between Ms. Vasishth's testimony and the DOT. Nor did she provide a reasonable explanation for crediting the testimony.

Accordingly, the ALJ erred both in its reliance on Dr. Hillbrand's testimony without explaining or addressing its obvious inconsistency, and by relying on testimony by the vocational expert that was inconsistent with the DOT, without eliciting a reasonable explanation for the conflict. *See* SSR 00-4P (the professional experience of a vocational expert alone is not a reasonable explanation for relying on such testimony rather than the DOT); *see also Pratts*, 94 F.3d at 37 ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" (quoting *Echevarria*, 685 F.2d at 755).

### B.  The Residual Functional Capacity Assessment

The ALJ found that, in the absence of substance abuse, Scott P. could perform light work,

but that he had several additional limitations. More specifically, she found that he could: occasionally navigate ramps and stairs, but not ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and frequently handle. *Id.* ¶ 7. ALJ Horton further found that Scott P. was limited to simple, routine tasks, and that he could not perform belt-work or other pace-dependent work, but that he could work individually and self-pace. *Id.* Finally, she concluded that Scott P. could not work with the general public or perform collaborative work or teamwork, but that he could occasionally interact with others. *Id.*

Scott P. argues that the ALJ made a number of errors in assessing his residual functional capacity, and that her assessment is not supported by substantial evidence. The Court addresses the ALJ's physical and mental RFC assessments in turn.

### 1.  Physical RFC

Scott P. argues that the ALJ impermissibly assessed his physical RFC in several different ways. First, he notes that ALJ Horton's assessment of his physical RFC did not match any of the three different medical opinions assessing his physical limitations, but rather incorporated elements of each. This means, he argues, that ALJ Horton "necessarily impermissibly relied instead on her lay assessment of the medical evidence to arrive at her RFC determination." Pl. Brief at 12. He also argues that the ALJ failed to specify the elements of the RFC on a function-by-function basis, as required by Rule 96-8p. *Id.* at 11 (noting that the ALJ did not specifically evaluate sitting, standing, walking, lifting, or carrying). Finally, Scott P. challenges the ALJ's finding that his cane was not medically necessary, since the cane was prescribed by his treating orthopedist and no physician found it to be unnecessary. *Id.* at 13. The determination regarding his need for a cane was critical, he argues, because it would have altered the ALJ's findings with respect to his ability to perform light jobs, which entail standing and/or walking up to six hours

per day. *Id.*

The Commissioner responds that the RFC assessment is administrative, not medical, in nature; therefore it may be made by an ALJ and need not perfectly match any single medical opinion in the record. Def. Brief at 4–5, citing *Curry v. Comm'r of Soc. Sec.*, 855 Fed. App'x 46, 49 n.3 (2d Cir. 2021); *Matta v. Astrue*, 508 Fed. App'x 53, 56 (2d Cir. 2013) (summary order). The Commissioner argues that the ALJ's assessment was thorough and incorporated the findings, diagnostic tests, subjective reports, and treatment notes from the record. Def. Brief at 7. The Commissioner further notes that none of the three medical opinions relied upon by ALJ Horton assessed greater limitations than the ultimate RFC finding. *Id.* at 6. Finally, the Commissioner argues that the ALJ reasonably concluded that Scott P.'s cane was not medically necessary because there was no information to the contrary in the record, and because there was evidence that Scott P.: (1) generally did not use his cane at medical visits after it was prescribed, and (2) was able to perform robust activities of daily living, including moving large objects and doing yardwork. *Id.* at 7–8.

Scott P. responds that the Commissioner's arguments regarding the RFC determination amount to little more than "post hoc rationalization." Pl. Reply at 6. He argues that the ALJ made the RFC determination in reliance upon assessments by state agency physicians who were not fully apprised of his limitations. *Id.* He further argues that, in determining that his cane was not medically necessary, the ALJ improperly made a connection between the medical data and his actual functional capabilities. *Id.* at 7 (citing *Bauer v. Comm'r of Soc. Sec. Admin.*, 2018 WL 4181769, at *4 (W.D.N.Y. Aug. 31, 2018)). Given the evidence in the record, he argues, the ALJ should have further developed the record on this issue and considered the impact of his cane usage on his ability to perform light work. Pl. Reply at 7.

The Court agrees with each party, in part.

As a preliminary matter, the RFC assessment is an administrative determination for which the ALJ bears "the final responsibility." 20 C.F.R. § 404.1527(d)(2). "[T]he ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022). In fact, the ALJ's function is to weigh the evidence as a whole and resolve any conflicts. *See Richardson*, 402 U.S. at 399 ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). The Court therefore disagrees that ALJ Horton's physical RFC assessment was impermissible because it did not match any of the three medical opinions in the record.

The Court similarly disagrees that the ALJ's failure to specify each element of the RFC on a function-by-function basis was error. "[T]he failure explicitly to engage in such a function-by-function analysis does not constitute *per se* error requiring remand." *Cichocki*, 729 F.3d at 173–74. Instead, the relevant inquiry is whether the ALJ applied the correct legal standards and whether the determination is supported by substantial evidence. *Id.* at 177. An ALJ need not address explicitly those capacities for which no limitation was alleged, nor those limitations about which there is no conflicting medical evidence. *Id.* (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary.")); *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. App'x 542, 547 (6th Cir. 2002) ("Although SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged."). However, "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform

relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki*, 729 F.3d at 177.

Here, the ALJ wrote, "After careful consideration of the entire record, the undersigned finds that, if the claimant stopped the substance use, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: occasional ramps and stairs; no ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; frequent handling; simple, routine tasks; no belt-work or pace-dependent work . . . ." Tr. at 1161. While ALJ Horton did not explicitly list a finding for each function, her decision implies that she found Scott P. had the residual functional capacities for light work outlined in the 20 CFR 404.1567(b) and 416.967(b), with only the enumerated additional limitations. Such an implicit finding of functional limitations is generally permissible. *See Cichocki v*, 729 F.3d at 177 (citing *Depover v. Barnhart*, 349 F.3d 563, 567–68 (8th Cir. 2003) ("[W]e believe that the ALJ implicitly found that Mr. Depover was not limited in these functions, and in this instance we do not see any reason to remand to make the findings explicit.")).

The statutory definition of "light work," however, does not set a specific limit on the amount of walking or standing an individual can do. *See* 20 C.F.R. §§ 404.1567(b) and 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."). The Social Security Regulations provide a similar level of detail about typical jobs categorized as light work, stating that "a job is in this category when it requires a good deal of walking or

standing—the primary difference between sedentary and most light jobs." SSR 83-10, 1983 WL

31251, at *6. Additionally, "[r]elatively few unskilled light jobs are performed in a seated

position." *Id.*

     During the hearing, Scott P. testified that he would only be able to comfortably remain

standing at one time for about five minutes. Tr. at 1203. He also testified that he regularly

walked for around ten minutes "but that's about normally as far as [he'd] walk." *Id.* At the

hearing, Scott P.'s girlfriend also testified that he struggled to stand for long periods of time and

that he experienced "pain and discomfort." *Id.* at 1210–11. And, at a July 14, 2021 appointment,

Dr. Hardeep Singh wrote that Scott P. was using a cane to ambulate and reported severe neck

and shoulder pain. *Id.* at 1833. At the same time, Dr. Singh wrote that Scott P. denied any gait

instability during his appointment. *Id.* Moreover, as noted by the Commissioner, the record

contained several medical evaluations, albeit ones from years prior, that suggested Scott P. did

not have such limitations. On March 8, 2017, Dr. Dodenhoff found that Scott P. could sit, stand,

and walk. Tr. at 550. In November 2017, Dr. Duckwall found that Scott P. could stand or walk

for about six hours in an eight-hour workday. Tr. at 94. And, in February 2018, Dr. Braverman

found that he could stand or walk for about 6 hours in an eight-hour workday. Tr. at 122.

     Taken together, this "contradictory evidence in the record" required a specific finding

regarding Scott P.'s functional limitations related to walking and standing. *See Cichocki*, 729

F.3d at 177 ("[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity

to perform relevant functions, despite contradictory evidence in the record . . ."). Especially

given the significance of Scott P.'s ability to walk or stand in determining his ability to do light

work, this failure to make an explicit finding was error.

     Finally, the Court finds that ALJ Horton's determination that Scott P.'s cane was not

medically necessary was supported by substantial evidence. In her decision, the ALJ wrote that "The claimant's orthopedist did give the claimant a cane prescription in August 2019, but it is notable that this was in response to a request by the claimant, and the orthopedist did not provide an explanation why such a device was necessary[.]" Tr. at 1165. The ALJ noted that in subsequent examinations, Scott P. did use his cane, except for one 2021 appointment in which he "denied gait instability." *Id.* Based on this record, the ALJ concluded that "the record does not establish the medical necessity of a cane." *Id.*

The Social Security Rules specify that "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9P, 1996 WL 374185, at *7. Generally, the plaintiff bears the burden of proving that an assistive device, such as a cane, is medically necessary. *Vanever v. Berryhill*, No. 16-CV-1034, 2018 WL 4266058, at *2 (W.D.N.Y. Sept. 6, 2018).

"[T]he fact that a cane was prescribed at plaintiff's request is not dispositive of whether the cane was medically necessary." *James L. v. Comm'r of Soc. Sec.*, No. 22-CV-0397 MWP, 2023 WL 5662790, at *5 (W.D.N.Y. Sept. 1, 2023); *see also Rowe v. Berryhill*, No. 1-17-CV-00208-MAT, 2018 WL 4233702, *4 (W.D.N.Y. Sept. 6, 2018) ("Insofar as the ALJ suggested Plaintiff's use of a cane lacked legitimacy because Plaintiff protectively requested the cane to assist with his ambulation, the fact remains that his treatment provider supplied a valid prescription to Plaintiff for its use.") Moreover, "a cane need not be prescribed to be considered medically necessary[.]" *Allen v. Comm'r of Soc. Sec.*, No. 5:14-CV-1576 (DNH/ATB), 2016 WL

996381, at *7 (N.D.N.Y. Feb. 22, 2016). The ALJ's note that Scott P.'s cane was prescribed at his request is therefore insufficient to support her conclusion that it was not medically necessary.

The Court finds, however, that ALJ Horton's additional reasoning—including the evidence that Scott P. generally did not use his cane when attending subsequent appointments, except for one in 2021, at which he denied gait instability and had a routine lower extremity examination—was sufficient to support her determination. Additionally, although Scott P. had a prescription for the cane, the record did not include any medical evidence describing why, or in what circumstances, the cane was necessary. *See* SSR 96-9P. Given that Scott P. bore the burden of proving the medical necessity of the cane, and the ALJ weighed the relevant evidence in the record before making her determination, the Court cannot find that the ALJ erred in finding the cane not medically necessary.

### 2. Mental RFC

Scott P. also challenges the ALJ's assessment of his mental RFC, which he argues failed to explain how or whether the particular limitations she assessed were supported by any of the three medical opinions she partially credited. Pl. Brief at 14. He further argues that the ALJ's use of Dr. Hillbrand's opinions regarding his mental RFC, while omitting any discussion of Dr. Hillbrand's findings regarding his Global Assessment of Functioning (GAF) score, was a reversible error. Finally, Scott P. argues that the ALJ impermissibly ignored a restriction noted by at least two reports—finding that he was restricted to working in a "low demand" setting or environment. *Id.* at 15–16.

The Commissioner argues that the ALJ's mental RFC assessment was supported by substantial evidence, including Scott P.'s limited mental health treatment, the mental status examination findings, opinion evidence by agency physicians, and the record of his robust

activities of daily living during the relevant period. Def. Brief at 10. The Commissioner also argues that Scott P. has not been harmed by the ALJ's mental RFC assessment because "the ALJ's finding for simple routine work with limited interaction with others is more restrictive than all the opinions regarding [Scott P.'s] mental status." *Id.* at 12. Finally, the Commissioner argues that the failure to discuss Scott P.'s GAF scores does not necessarily mean that the ALJ did not consider it; regardless, the Commissioner emphasizes that GAF scores have limited relevance when inconsistent with other evidence because they do not reflect an individual's longitudinal functional capacity and are only based on a specific moment in time. *Id.* at 14.

The Court agrees.

As a preliminary matter, the Court cannot find that the ALJ's mental RFC determination was improper merely because it did not explicitly include a restriction to working in a "low demand" setting or environment, as discussed in two assessments in the record. Tr. at 1297–98, 1304–05. The ALJ found that Scott P. could do simple, routine work, that he was unsuited to belt-work or pace-dependent work, and that he could not work with the general public or in a collaborative team environment. Tr. at 1161–62. Scott P. has not explained what restrictions, beyond those found by the ALJ, would have been included in a "low demand" setting restriction, nor how such additional restrictions were supported by the record. Moreover, he has not provided any argument as to how limiting his work to a "low demand" setting would have affected the vocational expert's determination regarding the jobs he would be qualified for. Accordingly, the Court finds that the ALJ's determination regarding the environment in which Scott P. would be able to work was supported by substantial evidence.

The Court similarly cannot find that the ALJ's omission of Scott P.'s GAF scores was a reversible error. The GAF scale is promulgated by the American Psychiatric Association as a

tool to assist with tracking the clinical progress of individuals with psychological problems in global terms. *Kohler*, 546 F.3d at 262 n.1; AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000). GAF scores have since been removed from the Diagnostic and Statistical Manual of Mental Disorders (DSM), in part because of the scale's "conceptual lack of clarity" and "questionable psychometrics in routine practice." *Amy P. v. Comm'r of Soc. Sec.*, No. 2:17-cv-94, 2018 WL 2095345, at *6 (D. Vt. May 7, 2018) (citing AM. PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013)).

Subsequently, the Social Security Administration released guidance limiting ALJs' use of GAF scores when making disability determinations. *See* SOC. SEC. ADMIN., Supp. ALJ Training (Jan. 17, 2017). The guidance noted that GAF ratings are not standardized; that, without supporting detail, they are too general to meaningfully assist evaluators; that they are not specific to a specific symptom severity or limitation and therefore do not easily map onto functional limitations; and that they lack longitudinal context. *Id.* at 33–34. ALJs were directed to consider GAF ratings as evidence but were warned that they were "inherently of little evidentiary value in [the] adjudication process." *Id.* GAF scores should therefore be considered as a medical opinion by a treating physician. *Id.* at 35. ALJs were warned not to: (1) use a GAF score as objective medical evidence of a medically determinable impairment, (2) rely solely upon a GAF rating to support a disability determination, (3) equate any particular GAF score with a specific limitation, or (4) equate a particular GAF rating with a particular mental RFC. *Id.* at 35–36. The SSA has instead "instruct[ed] ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used." *Davila v. Comm'r of Soc. Sec.*, 16-CV-4774 (KAM), 2018 WL 5017748, at *24 (E.D.N.Y. Oct. 16, 2018) (quoting Soc. Sec.

Admin. Bulletin 2 (July 31, 2013)).

The caselaw in this Circuit suggests that, where the ALJs findings regarding a claimant's mental RFC comport with the record, an inconsistent GAF score is "not entitled to significant weight." *Rock v. Colvin*, 628 Fed. App'x 1, 4 (2d Cir. 2015). Additionally, the proposition that GAF scores generally provide a reliable basis for disability determinations has been "questioned by several courts, both before and after the removal of the GAF metric from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Id.* at 4 n.3 (citing *Berry v. Comm'r of Soc. Sec.*, No. 14 Civ. 3977(KPF), 2015 WL 4557374, at *3 n.10 (S.D.N.Y. July 29, 2015) ("the utility of [the GAF scale] is debatable, particularly after its exclusion from the fifth edition of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS.")); *Schneider v. Colvin*, No. 3:13-cv-790 (MPS), 2014 WL 4269083, at *4 n.5 (D. Conn. Aug. 29, 2014) (explaining that "a GAF score is merely a 'snapshot opinion of one or more doctors as to an individual's level of social, psychological and occupational function at a specific point in time[,]' whereas '[a] determination of disability must be based on the entire record.'") (quoting *Malloy v. Astrue*, No. 10-cv-190, 2010 WL 7865083, at *26 (D. Conn. Nov. 17, 2010); *Mainella v. Colvin*, No. 13-CV-2453-JG, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) (explaining that GAF scores present a number of problems when used as a tool to determine a claimant's mental RFC, including their lack of standardization and their generality).

Moreover, even before the removal of the GAF scale from the DSM, an ALJ's failure to consider a claimant's GAF scores was not a reversible error. *See Schneider*, 2014 WL 4269083, at *4 ("Even prior to the release of the DSM-V in 2013, courts have held that an ALJ's failure to consider every GAF score is not a reversible error."); *Carrigan v. Astrue*, 2011 WL 4372651, at *7 (D. Vt. Aug. 26, 2011) (finding that an ALJ's failure to discuss GAF scores was not error

because "GAF scores—in and of themselves—do not demonstrate that an impairment
significantly interferes with a claimant's ability to work."), *report and recommendation adopted*,
No. 10-cv-303, 2011 WL 4372494 (D. Vt. Sept. 19, 2011); *Parker v. Comm'r of Soc. Sec.
Admin.*, No. 10-cv-195, 2011 WL 1838981, at *5 (D. Vt. May 13, 2011) ("[A]n ALJ's failure to
reference a GAF score is not, standing alone, sufficient ground to reverse a disability
determination.") (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002));
*Zabala v. Astrue*, No. 5-cv-4483, 2008 WL 136356, at *4 (S.D.N.Y. Jan. 14, 2008) (internal
quotation marks and citations omitted) ("[T]he ALJ is not required to reconcile explicitly every
conflicting shred of medical testimony. Nor is the ALJ required to mention or discuss every
single piece of evidence in the record. Here, while the ALJ did not specifically discuss
[Plaintiff's] low GAF score, the ALJ did expressly discuss the clinical notes that accompanied
the score. Moreover, this GAF score was assessed when [Plaintiff] had forgone all mental health
treatment for more than one year, and was followed eight days later by a GAF score of fifty-five,
which is indicative of only moderate symptoms."), *aff'd*, 595 F.3d 402 (2d Cir. 2010).

Accordingly, ALJ Horton's failure to incorporate Scott P.'s GAF scores into her mental
RFC determination was not error, especially given the thoroughness of her discussion of his
mental functioning, as reflected by the various assessments in the record. *See, e.g.*, Tr. at 1166–
68.

The Court therefore affirms ALJ Horton's determination regarding Scott P.'s mental RFC
and finds that it was supported by substantial evidence.

### C.  The Allegedly Obsolete Jobs

Scott P. argues that the ALJ impermissibly relied upon the jobs provided by the
vocational expert. He first argues that the ALJ should not have relied upon any positions

characterized as light work because they were beyond his functional capacity, in part because of his need to use a cane. Pl. Brief at 18. He next argues that the two sedentary positions identified by Ms. Vasishth, addresser and document preparer, are obsolete positions that no longer exist in significant numbers. He therefore argues that the Commission failed to meet its burden at Step Five to prove that he can perform "work that exists in significant numbers in the national economy." *Id.* § 404.1520(g)(1).

The Commissioner replies that Petitioner "has failed to identify any harmful error here," because even if the addresser and document preparer jobs were obsolete, Petitioner could still perform the three light work positions identified by Ms. Vasishth, photocopy machine operator, mail clerk, and price marker. Def. Brief at 15.

Given the outstanding issues regarding Scott P.'s RFC—specifically, his ability to stand and walk for long periods of time—and their resulting impact on his ability to perform light work, the Court cannot fully resolve this question at this time. Indeed, whether Scott P. is able to walk or stand for the six hours generally required for light work positions is critical to determining whether the vocational expert's testimony was accurate in this case.[2]

There is some question, however, whether Ms. Vasishth's testimony regarding the

---

[2] ALJs are not required to consider "reasonable accommodations" at Step 5. *See* SSR 00-1c, 2000 WL 38896, at *5 (clarifying that ALJs are not required to consider "reasonable accommodations" for alternative work at step five of the evaluation process because such determinations are workplace-specific and would strain already limited and burdened administrative resources). Rather, applying *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795 (1999) (clarifying that an individual may simultaneously pursue a claim under the ADA while applying for or receiving social security disability insurance benefits), courts have found that Step 5 may be satisfied by a job that the plaintiff can perform only with reasonable accommodations. *See Rotolo v. Comm'r of Soc. Sec.*, No. 6:16-CV-1252 (WBC), 2017 WL 6343673, at *8 (affirming the ALJ's finding that there existed other jobs in significant numbers in the national economy that the plaintiff could perform, even though the plaintiff would require a reasonable accommodation in the form of a "sit/stand option"); *Straite v. Berryhill*, No. 3:16-CV-00006-FDW, 2017 WL 4052170, at *4 (W.D.N.C. Sept. 13, 2017) (rejecting the idea that "anyone who requires an accommodation is disabled" and affirming the ALJ's assessment that, although the plaintiff would require a sit/stand option, she was capable of working); *Harry v. Colvin*, No. 1:15-CV-01514, 2016 WL 4708009, at *17 (N.D. Ga. Sept. 8, 2016) (affirming the ALJ's finding that the plaintiff was capable of working "in an ordinary work setting," despite the plaintiff's claim that she would require accommodations for her obesity).

addresser and document preparer positions would have been sufficient to meet the Agency's

burden to prove that there exists work in the national economy that Scott P. would be able to

perform. Vocational experts, including Ms. Vasishth, generally rely on the Dictionary of

Occupational Titles (DOT), which was published in 1977 and last updated in 1991. Both of the

sedentary positions identified by Ms. Vasishth (addresser[3] and document Preparer[4]) and defined

by the DOT have been found—either by the SSA itself, or by other courts—to be obsolete.

An internal study by the Social Security Administration found that the job of Addresser

was cited in 9.5% of Step 5 denial cases, but noted that "It is doubtful that [this job], as described

in the DOT, currently exist[s] in significant numbers in our economy." Ex. C to Pl. Brief at 7,

ECF No. 23-3 (Mar. 6, 2023). Other courts have found this position obsolete, as well. *See, e.g.*,

*N.B. v. Saul*, Case No. 20-cv-01138-LB, 2021 WL 1947526, at *11 (N.D. Cal. May 14, 2021)

("the job of addresser is obsolete and does not exist in significant numbers"); *Yanke v. Kijakazi*,

Case No. 20-CV-1055, 2021 WL 4441188, at *4 (E.D. Wis. Sept. 28, 2021) (describing the

position of addresser as "resoundingly obsolete"); *Skinner v. Berryhill*, No. CV 17-3795-PLA,

2018 WL 1631275, at *6 (C.D. Cal. Apr. 2, 2018) ("[I]t is not unreasonable to assume that the

occupation of 'addresser,' which – as described by the DOT – provides for addressing envelopes

by hand or by typewriter, is an occupation that has significantly dwindled in number since 1991

---

[3] According to the DOT, an Addresser "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing [and m]ay sort mail."

[4] According to the DOT, a Document Preparer "[p]repares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices: Cuts documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduces document pages as necessary to improve clarity or to reduce one or more pages into single page of standard microfilming size, using photocopying machine. Stamps standard symbols on pages or inserts instruction cards between pages of material to notify MICROFILM-CAMERA OPERATOR (business ser.) 976.682-022 of special handling, such as manual repositioning, during microfilming. Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule."

in light of technological advances."); *Candice E. v. Berryhill*, No. 6:18-CV-01261-YY, 2019 WL 2550318, at *5 (D. Or. June 20, 2019) (finding that the ALJ "erred in relying on the VE's testimony that plaintiff could perform the job[ ] of addresser" because that job is obsolete); *Jason Robert F. v. Comm'r of Soc. Sec. Admin.*, 3:20-cv-00201-BR, 2021 WL 1010946, at *8 (D. Or. Mar. 16, 2021) ("[T]he Court concludes the job of Addresser is obsolete, and, therefore, the ALJ erred at Step Five when she found that job exists in significant numbers in the national economy.").

Courts have found similarly regarding the position of document preparer. *See, e.g.*, *Corey S. v. Comm'r of Soc. Sec.*, No. 5:20-CV-0678 (ML), 2021 WL 2935917, at *12 (N.D.N.Y. July 13, 2021) (finding that, "[i]n light of the overwhelming evidence that the document preparer position, as defined in the DICOT, is obsolete in the national economy," it was error to rely solely on vocational expert testimony that there were a substantial number of such jobs in the national economy that the plaintiff could perform); *Cunningham v. Astrue*, 360 Fed. App'x 606, 616 (6th Cir. 2010) (remanding a case "for consideration of whether the DOT listings, specifically the document preparer and security monitor descriptions, were reliable in light of the economy as it existed at the time of the hearing before the ALJ"); *Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 222 (E.D.N.Y. 2021) (finding that it "strains credibility" to suggest that there are a substantial number of document preparer positions available in the national economy, given that "the technology underlying such a career is rapidly descending into obsolescence"); *Kordeck v. Colvin*, No. 2:14-cv-432-JEM, 2016 WL 675814, at *9 (N.D. Ind. Feb. 19, 2016) (describing the document preparer position as one of several "jobs that have been reduced significantly in number if not rendered obsolete by the rise of the internet").

When asked about the source of her job numbers, Ms. Vasishth replied:

> It's a combination. As you likely know, the Bureau of Labor Statistics does not provide[] individual job numbers, but rather job numbers for a grouping of jobs. So I look at the occupations within a group. I assign an estimated weight or a percentage to each one of the jobs. I come up with a number like that. I bounce that off of Job Browser Pro which is the software I have which claims to be accurate in job numbers. I've found that sometimes it looks accurate and sometimes it can be – doesn't even make sense which is why I do that – all of that, and then I also bounce my numbers off of VEs that have been doing this longer than myself."

Tr. at 1229.

Scott P.'s attorney attempted to ask Ms. Vasishth more questions and objected to her job number testimony, but ALJ Horton did not investigate further through additional questioning.

Although the Court cannot reach a conclusion regarding the jobs testimony given the outstanding uncertainties regarding Scott P.'s RFC, upon remand, the ALJ is instructed to more thoroughly investigate the actual availability of the positions proposed by the vocational expert, particularly if they are among those likely to have become obsolete by advances in technology. *See, e.g.*, *N.B.*, 2021 WL 1947526, at *11 ("the job of addresser is obsolete and does not exist in significant numbers"); *Corey S.*, 2021 WL 2935917, at *12 (finding that there is "overwhelming evidence" that the document preparer position is obsolete in the national economy).


## IV.    CONCLUSION

For the reasons explained above, Scott P.'s motion is **GRANTED**. The Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

The Clerk of Court is respectfully directed to close the case.

**SO ORDERED** at New Haven, Connecticut, this 23rd day of February, 2024.

>    */s/ Victor A. Bolden*
> Victor A. Bolden
> United States District Judge

31